# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action File No. |
| CLARENCE DEAN ALFORD, | JURY DEMAND |
| Defendant. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      This case involves a fraudulent offering of securities by Clarence Dean Alford ("Defendant" or "Alford"), a five-term former Georgia state legislator and former member of the Georgia Board of Regents. From 2017 to 2019, Defendant fraudulently induced at least 100 investors, predominantly from the Indian-American community, to invest at least $23 million in unregistered, high-yield promissory notes (ranging from 12% to 34% annual rates of return)

purportedly issued by Allied Energy Services, LLC ("Allied").

2.     Allied was an energy development company, and Alford served as its Chief Executive Officer, President, and co-managing member since it was formed in about 2004 through late 2019.  Beginning in about 2014, Allied's energy-related business declined dramatically.  As a result, Allied began providing retrofit lighting services in 2016, which became its primary revenue source.

3.     Beginning as early as January 2017, Alford grossly misrepresented to potential investors in the promissory notes, among other things, Allied's financial condition, leading investors to falsely believe that Allied was a robust and thriving energy-related business.  Defendant also misrepresented and exaggerated Allied's experience and expertise in developing various energy projects to further entice prospective investors.  As a result, he gave investors the false impression that the investment opportunities that he offered purportedly through Allied would be lucrative.

4.     In an effort to conceal from Allied's Chief Financial Officer and co-managing member his solicitation of investors, Alford unilaterally and surreptitiously opened a bank account in Allied's name without the knowledge

and consent of Allied's CFO.  Alford established sole control over the account, which he used to deposit investors' funds.

5.     In addition to misrepresenting Allied's financial condition, Alford also falsely told potential investors that their funds would be used to finance Allied's development of a waste-to-energy-conversion project and to support a purported solar energy program.  Contrary to such representations, Defendant knowingly used investor funds to pay personal expenses, including construction costs associated with a multi-million dollar home, and to make interest payments to earlier investors

6.     Alford's scheme collapsed in 2019.  By April 2019, Alford missed interest payments owed to several investors, and he thereafter failed to repay investors' principal.  In October 2019, Alford was arrested by Georgia authorities for racketeering and attempted theft charges.  In February 2020, Allied was forced into involuntary Chapter 7 bankruptcy in United States Bankruptcy Court for the Northern District of Georgia.

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act of 1933

("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

8.     This Court has jurisdiction over this action pursuant to Section

22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the

Exchange Act [15 U.S.C. § 78aa(a)].

9.     In connection with the transactions, acts, practices, and courses of

business described in this Complaint, Defendant, directly and indirectly, made

use of the means or instrumentalities of interstate commerce, of the mails,

and/or of the means and instruments of transportation or communication in

interstate commerce.

10.     Venue is proper in this district as Defendant resides in this district.

## FACTS

**A.     Defendant**

11.     **Clarence Dean Alford** is a resident of Conyers and Eatonton,

Georgia.  During all relevant periods, he was the President, Chief Executive

Officer, and a member of Allied Energy Services, LLC.  He is a former five-

term member of the Georgia state legislature and a former member of the

Georgia Board of Regents.

B.     **Related Entity**

12.     **Allied Energy Services, LLC**, is a Georgia-organized company with its principal place of business in Conyers, Georgia.  During all relevant periods, Allied provided lighting retrofit services to businesses and purported to develop solar energy and waste-to-energy projects for municipalities.  From in or about 2004 until in or about October 2019, Alford was the CEO of Allied. Since in or about 2013, Alford has been one of two members of Allied.

13.     Beginning in about 2014, Allied's business in energy development projects declined significantly, and by 2016, Allied's revenues were derived primarily from providing lighting retrofit services.

14.     In or about 2015, Allied began developing a project to convert municipal solid waste into fuel, and it purportedly planned to build a waste-to-energy conversion facility on the site of a landfill in Augusta, Georgia (the "Augusta WTE Project").

15.     In 2017, Allied formed Augusta Waste-to-Energy, LLC ("Augusta WTE LLC") as a wholly owned subsidiary through which it continued development of the Augusta WTE Project.

16.   In September 2017, Augusta WTE LLC entered a 20-year lease with the Augusta Solid Waste Management Authority for a 10-acre site on a city landfill in Augusta, Georgia.  In about May 2018, Allied received approval from the Augusta Economic Development Authority of Richmond County ("DARC") to issue up to $68 million in industrial revenue bonds to finance the project.  To date, Allied has not engaged a bond underwriter, and no bonds have been sold.

17.   Allied has been non-operational since at least November 2019. Allied went into involuntary Chapter 7 bankruptcy on February 20, 2020, after it failed to respond to an involuntary bankruptcy petition filed by five investors in United States Bankruptcy Court for the Northern District of Georgia.

**C.   <u>Alford Enticed and Solicited Investors</u>**

18.   From 2017 to 2019 (the "Relevant Period"), Defendant, without the knowledge or consent of Allied's other member, who was also Allied's CFO, issued promissory notes in Allied's name to at least 100 persons, predominantly from the Indian-American community, purportedly to finance either the Augusta WTE Project (the "WTE Notes") or Allied's "Solar Program" (the "Solar Notes") (collectively, the "Notes").  Specifically, from

-6-

January 2017 to September 2019, Defendant raised at least $23 million from investors who purchased the Notes, which are securities.

19.     Defendant told prospective investors that Allied was a profitable and thriving energy-related business.  Contrary to such representations, Defendant knew that Allied's business was struggling, forcing cuts in staffing and resources beginning as early as 2014.  Allied's business was actually conducted predominantly by its CFO, and nearly all of its revenue was derived from providing retrofit lighting services from 2016 through 2019.

20.     Alford took additional steps to fraudulently entice and retain investors, including emailing at least one investor a purported financial statement depicting false information about Allied's financial condition.

21.     The financial statement conveyed the false impression that it was prepared (or at least reviewed) by an accounting firm by including on the cover page of the financial statement the words, "Jones, McKnight & Edmonson, P.C.[,] Certified Public Accounts [sic]".  In fact, that firm never reviewed or prepared any financial statements for Allied.

22.     As to the content of the financial statement, it conveyed falsely that Allied had millions in assets and revenues from 2016 through 2018.  The

financial statement included a "Balance Sheet as of 12/31/18" showing total assets of approximately $162 million (including $5 million in cash), and an "Income Statement" showing that Allied generated "total gross revenue" of approximately $33.8 million, $36.3 million, and $40.5 million in 2016, 2017, and 2018, respectively.  In fact, Allied's federal tax returns reflected that, during the same time period, it had less than $1 million in assets and far less in "gross receipts," declining to only $434,342 in 2018.

**D.     <u>Notes Purchased by Investors</u>**

23.     Defendant offered and sold Notes purportedly in Allied's name as a means to invest in the Augusta Waste-to-Energy Project or its Solar Program, and which purportedly offered and promised appealing rates of return to investors.

24.     Investors, predominantly from the Indian-American community, bought individual Notes ranging from $25,000 to at least $825,000 each, with many investors having purchased at least two Notes.

25.     The Notes had rates of return ranging from 12% to 34% to be paid monthly, quarterly, or annually, with nearly all of the Notes maturing in one year.

26.     Many of the Notes depicted either a "corporate guarantee" by Allied or Defendant's "personal guarantee."  At least some of the WTE Notes include an equity-conversion clause, which provides the option to convert unpaid principal into equity shares of Augusta WTE LLC.

27.     Aside from WTE Notes with the conversion clause, the faces of the Notes do not indicate whether the corresponding investment was for the Augusta WTE Project or the Solar Program.  Many investors indicated which Note they were purchasing by either emailing Defendant, writing it in the memo line of their investment checks, or including it with their wire transfer instructions.

28.     Defendant advised some investors that they could invest as individuals or pool funds among multiple investors by forming LLCs through which to invest.  Investors submitted their investments by either mailing a check made payable to Allied or by wire transfer to a bank account for which Alford provided wire instructions.  In some instances, multiple members of a family invested by pooling their funds and forming an LLC.

29.     Allied's business accounts have been maintained at Bank OZK (or its predecessors) since at least 2008.  Alford nevertheless instructed investors to

wire their funds to an account at Bank of America (the "Allied Investor Account").  Alford also deposited checks received from investors into that account.

30.    Alford had sole authority over the Allied Investor Account, which he had surreptitiously opened in 2015 without the knowledge of Allied's CFO or any other Allied employee.  On the account-opening documents, Alford asserted falsely that Allied was a single member LLC of which he was the managing member.

**E.    Alford's Misrepresentations Regarding Use of Funds**

31.    Regarding the WTE Notes, Alford represented orally to prospective investors that their money would finance the costs to develop and complete the waste-to-energy conversion facility at the project site.  Alford represented that the Augusta WTE Project would earn profits from sales of the facility's fuel outputs, and these profits would be shared by investors who exercised the equity-conversion clause in their respective notes.

32.    In promoting the Solar Notes, Alford represented that investors' money would serve as the escrow funds Allied needed to secure contractual rights to buy land on which Allied and its "solar partners" would develop solar-

energy generation facilities for Georgia Power's Advanced Solar Initiative ("ASI").

33.    According to both a "Solar Business Plan" and a "Solar Proposal" Alford emailed to prospective investors, for each solar project site Allied secured "in escrow," Allied would submit a bid on its solar partner's behalf to Georgia Power for the right to develop a solar-energy facility.  If Allied's bid was selected, Allied would close on the project-site property on behalf of its solar partner, who would in turn repay Allied the purchase price amount that Allied had placed in escrow.  If Allied's bid was rejected, Allied would cancel the land contract (or allow the contractual purchase option to expire) and withdraw the funds from the escrow account.  In either case, investors were told that Allied would return the principal of the escrow funds to them.

34.    According to the Solar Business Plan, regardless of whether Allied's bid was selected, Allied would receive a "bid fee" from its solar partner, and there was "no risk to funds in the escrow account."

35.    The Solar Business Plan stated that Allied had "teamed up" and had "partnerships" with several "international solar companies," including Enerparc and SunEarth.

36.     In fact, Alford knew that Allied never had an agreement or partnership with any of the solar companies listed in the Solar Business Plan.

37.     The Solar Business Plan stated that Allied had developed "utility scale" solar projects, meaning that the projects could produce sufficient energy to service large numbers of people.

38.     In fact, Alford knew that Allied never had the ability or expertise to develop utility scale solar projects.

39.     The Solar Business Plan stated that Allied spent $2,750,000 in 2017 "locating, researching, and preparing bids" on 23 properties for 2018; and had received approximately $20 million in bid fees from its "solar partners" over the prior three years.

40.     In fact, Alford knew that Allied did not spend anything close to $2.7 million preparing solar-project bids in 2017, and never had a consecutive three-year period in which it received $20 million in fees of any kind.

41.     Alford represented to prospective investors that funds invested in the Solar Program would be kept separate from the WTE Note proceeds.

42.     Alford represented to prospective investors that proceeds from the WTE Notes would be used to develop and build the waste-to-energy facility in Augusta, Georgia.

43.     Alford represented to prospective investors that funds invested in the Solar Program would always be kept in escrow and held in a no risk escrow account that cannot move until Georgia Power's ASI awarded Allied a specific solar project, and that the bid fees would enable Allied to pay the promised interest on the Solar Notes.

44.     In fact, Alford knew that the Solar Note proceeds were not kept separate from the WTE Note proceeds.  Alford also knew that all investor funds were commingled in the Allied Investor Account, which was not an escrow account.  Upon information and belief, none of the investor funds were ever deposited into an escrow account.

**F.     Alford's Misappropriation and Misuse of Investors' Funds**

45.     Rather than using the approximately $23 million in investor funds to pay development costs for the Augusta WTE Project or as escrow funds for Solar Program projects, Alford misappropriated the majority of these funds for unrelated purposes.

-13-

46.     Alford sent approximately $5.79 million of investor funds to his personal bank accounts (of which approximately $65,000 was subsequently used to purchase a Tesla and $910,800 was paid to the architect and builder of his multi-million dollar house in Utah), used approximately $380,000 to pay his personal credit card bills, sent $264,540 directly to the builder of his multi-million dollar house, made approximately $51,320 in cash withdrawals, and contributed $13,900 to political campaigns.

47.     In addition to the investor funds diverted to his personal bank account and for other personal purposes, Alford also spent approximately $1.5 million of investor funds to finance an unrelated food-distribution venture, sent approximately $784,000 to an unrelated company he owns, and spent approximately $7.6 million to repay outstanding debts he incurred on Allied's behalf before the Relevant Period.

48.     Alford also spent approximately $2.6 million of investor funds to make interest payments to investors during the Relevant Period.

## G.     Alford Defaults on Investors' Notes and His Scheme Collapses

49.     By April 2019, many of the Notes were in default.  In response to investor questions about missed interest payments, Alford told several investors

that payments had been or would be mailed to them.  These investors either never received the payments Alford claimed to have mailed, or the checks they received bounced when they tried to deposit them.

50.    At a meeting in Columbus, Georgia in June 2019, Alford attempted to convince nearly 20 investors in attendance to extend their overdue Notes until December 31, 2019, and to invest in ongoing solar projects for purported returns of 15% annualized interest.  Alford represented that, among other things, the DARC-approved industrial revenue bonds would be sold within the next two months to provide additional financing for the Augusta WTE Project, and that Allied did not have a money problem.

51.    In fact, as of the date of this complaint, the bonds have still not been underwritten, marketed, or sold.

52.    During the June 2019 meeting, Alford said investors seeking immediate repayment would be paid in full by August 30, 2019, while those extending their Notes would be paid quarterly interest by July 31, 2019.  In fact, neither type of payment was made.

53.    On or about September 30, 2019, Alford met with several investors in Augusta, Georgia.  In addition to repeating his false claims that the Solar

Program investments were in escrow and cannot be touched, he claimed that the Note defaults were due in part to violations of a cash coverage covenant on a loan Allied had obtained from Bank of America for a solar project.

54.     Upon information and belief, Allied did not have a loan with Bank of America for a solar project during the Relevant Period.

55.     On October 15, 2019, after news of Alford's arrest was widely reported, Alford's investors received an email purportedly from an Allied employee who announced that Alford had resigned as CEO, and that the company was taking steps to pay investors the amounts that they were owed.

56.     Upon information and belief, Alford sent the October 15, 2019 email under the guise of another email address.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

57.     Paragraphs 1 through 56 above are hereby realleged and are incorporated by reference.

58.     Between approximately January 2017 and September 2019, Defendant, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate

commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

59.     Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

60.     While engaging in the course of conduct described above, Defendant acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

61.     By reason of the foregoing, Defendant, directly and indirectly, violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and (a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and (a)(3)]

62.     Paragraphs 1 through 61 are hereby realleged and are incorporated by reference.

63.     Between approximately January 2017 and September 2019, Defendant, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate commerce

-17-

and by use of the mails, directly and indirectly:

      a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.    engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

64.    By reason of the foregoing, Defendant, directly and indirectly, has violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]

65.    Paragraphs 1 through 64 above are hereby realleged and incorporated by reference.

66.    Between approximately January 2017 and September 2019, Defendant, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and

by use of the mails, directly and indirectly:

        a.      employed devices, schemes, and artifices to defraud;

        b.      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

        c.      engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

67.    Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendant acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

68.    By reason of the foregoing, Defendant, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendant committed the violations alleged herein.

### II.

Permanent injunctions enjoining Defendant from violating, directly or indirectly, or aiding and abetting violations of the laws and rules alleged in this complaint.

### III.

A permanent injunction enjoining Defendant from, directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendant, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal accounts.

### IV.

An order requiring the disgorgement by Defendant of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## V.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendant.

## VI.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY TRIAL DEMAND

The Commission hereby demands a jury trial as to all issues so triable. This 30th day of July, 2020.

> */s/ M. Graham Loomis*
> M. Graham Loomis
> Regional Trial Counsel
> Georgia Bar No. 457868
> loomism@sec.gov

William P. Hicks
Senior Trial Counsel
Georgia Bar No. 351649
hicksw@sec.gov


United States Securities & Exchange Commission
950 E. Paces Ferry Road NE
Suite 900
Atlanta, GA 30326
404-842-7600